IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHARON CERCI,  )<br>  )<br>      Plaintiff,  )<br>  )<br>vs  )<br>  )<br>HARTFORD FINANCIAL SERVICES GROUP,  )<br>INC. and PROPERTY & CASUALTY  )<br>INSURANCE CO. OF HARTFORD,  )<br>  )<br>      Defendants.  ) | Civil Action No. 19-1588<br>Judge Stickman<br>Magistrate Judge Dodge |

## REPORT AND RECOMMENDATION

### I. Recommendation

It is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 28) be denied.

### II. Report

Plaintiff Sharon Cerci ("Ms. Cerci") brings this action against Defendants Hartford Financial Services Group, Inc. and Property & Casualty Insurance Co. of Hartford (collectively, "Hartford"). In this lawsuit, Ms. Cerci asserts that Hartford wrongfully denied benefits to which she is entitled under a property insurance policy issued to her by Hartford. Hartford denies that Ms. Cerci is entitled to the relief she seeks. Presently pending before the Court is Hartford's Motion for Summary Judgment.

#### A. Relevant Procedural History

Ms. Cerci originally commenced this action in the Court of Common Pleas of Allegheny County, Pennsylvania. Hartford subsequently removed the action to this Court on the basis of diversity jurisdiction.

Ms. Cerci's Complaint includes claims for breach of contract, bad faith in violation of 42

Pa. C.S. § 8371 and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 to 201-9.3 ("UTPCPL"). The parties subsequently stipulated to the dismissal of the UTPCPL claim. (ECF No. 26).

After the close of discovery, Hartford filed a motion for summary judgment (ECF No. 28), which has been fully briefed (ECF Nos. 29, 30, 33).

**B. Relevant Factual Background**

1. The Property and the Policy at Issue

Ms. Cerci purchased residential property located at 2703 Grandview Avenue, McKeesport, Pennsylvania, 15132 ("Property") in 2003. (Cerci Dep. (ECF No. 31 Ex. 1) 68:25-69:3.) She then moved in with her grandson, Michael Denmark ("Denmark"), and his family. On March 11, 2015, Ms. Cerci conveyed the property to herself and Denmark as joint tenants with rights of survivorship. (*Id.* at 119-20; Compl. Ex. 3.)[1]

Beginning in 2005, the Property was insured by Hartford and was renewed annually. (*id.* at 14:12, 118:8-10). At the time of the events at issue, Property & Casualty Insurance Co. of Hartford Policy No. 55RBB101700 was issued for the Property to Ms. Cerci with a policy period of November 15, 2017 to November 15, 2018 (the "Policy"). The Policy declarations identify Sharon Cerci as the "Named Insured," and describe the Property at 2703 Grandview Avenue as the "residence premises." (Defendants' Concise Statement of Material Facts ("DCSMF") ¶¶ 1-3.)[2] Ms. Cerci claims that she never received a copy the Policy. (Plaintiff's Reply to Hartford's

---

[1] These facts are contained in Ms. Cerci's brief.
[2] ECF No. 28.

Concise Statement of Material Facts ("PRCSMF") ¶ 18.)[3]

The Policy's grant of coverage provides:

> **SECTION I - PROPERTY COVERAGES**
>
> **A. Coverage A – Dwelling**
>
> 1. We cover:
>
> a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling;
>
> * * *
>
> 11. "Residence premises" means:
>
> a. The one family dwelling where you reside;
> b. The two, three or four family dwelling where you reside in at least one of the family units; or
> c. That part of any other building where you reside; and which is shown as the "residence premises" in the Declarations.

(DCSMF ¶ 4 & Ex. A at 2, 3.)

In 2014, Ms. Cerci purchased property located at 813 Sleepy Hollow Road in Castle Shannon, a Pittsburgh suburb (the "Castle Shannon Property"). Before purchasing the Castle Shannon Property, she contacted a Hartford agent to request a quote for a property and casualty policy. She informed Hartford in 2013 that she intended to purchase the Castle Shannon home and to live in both houses and was not told that this would preclude coverage for the Property. (PRCSMF ¶ 18.) When asked if she would be living at both the Property and the Castle Shannon Property, Ms. Cerci told the Hartford agent: "that[] sounds really how it will be. I believe I might be in the new home a little more than I am in the current home. But I will be in both of them." (ECF No. 31 Ex. 10 at 1.) According to Ms. Cerci, at no time during this conversation did the

---

[3] ECF No. 32.

agent inform her that she was limited to one "residence" or explain the term "residence premises" as set forth in the Policy. (Cerci Dep. (ECF No. 31 Ex. 1) 118:8-16.)

A January 2017 claim for water damage was approved by Hartford without incident. (PRCSMF ¶ 18.)

On November 30, 2017, the Property was substantially damaged in a fire. When Ms. Cerci submitted a claim under to the Policy to Hartford, a claims representative initially deemed the claim a covered peril before it was transferred to the "large loss department."[4] Subsequently, Ms. Cerci's claim was denied by Hartford on the ground that the Property was not her "residence premises" at the time of the loss on November 30, 2017. (DCSMF ¶ 18 & Ex. D.)

2. Cerci's Residence

The parties dispute whether the Property was Ms. Cerci's "residence premises" when the fire occurred. It is not disputed that Ms. Cerci stopped living at the Property full time in 2014, but the parties take different positions regarding where she "resided" thereafter. Hartford contends that Ms. Cerci has lived at the Castle Shannon Property since 2014 and resided there at the time of the fire. (*Id.* ¶ 5.) According to Ms. Cerci, however, she resided at the Property for the majority of her waking time. (PRCSMF ¶ 5.)

*Facts on which Hartford relies*

According to Hartford, Ms. Cerci moved out of the Property and into the Castle Shannon Property in 2014. That included moving her bed frame and various kitchen items out of the Property and acquiring new furniture including a table, dining room table, and china closet, all of which she moved into the Castle Shannon Property. She left some furniture at the Property to

---

[4] Hannon Dep. (ECF No. 31 Ex. 5) 16:5-12, 32:10-21.

4

ensure that her grandson and his family would have furniture. (DCSMF ¶¶ 6-10.)[5] She also transferred her landline and tax return filing address to the Castle Shannon Property. (*Id.* ¶ 11.)

Moreover, as Hartford notes, Ms. Cerci testified that after she moved out, she never slept at the Property again because she no longer had a bedroom there. Contrary to Ms. Cerci's statements about not sleeping at the Property, however, Mr. Denmark and his wife, Jessica, testified that she did occasionally sleep there and was experiencing memory difficulties. (PRCSMF ¶ 8.) According to Mr. Denmark, he could only recall three times when Cerci stayed overnight; Mrs. Denmark testified that she recalled her sleeping there "a couple of times" after she bought the Castle Shannon Property. Cerci slept on the couch when she spent the night. (DCSMF ¶¶ 15-17.)

Ms. Cerci transferred her landline and tax return filing address to the Castle Shannon address. Ms. Cerci testified that she took most of her meals at the Castle Shannon Property and would only eat dinner at the Property "once in a while." (*Id.* ¶ 12.) Hartford also notes that she visited the Property three or four times a week, mainly to collect the mail and check to make sure everything was all right. (*Id.* ¶ 13.) Ms. Cerci also testified that when she visited the Property, it would ordinarily be for "a half hour to an hour" and she would only stay longer if there was work to be done. (*Id.* ¶14.)

---

[5] While not material to the resolution of her claim, Ms. Cerci denies that she bought "new" furniture for the Castle Shannon home, stating that it was second-hand furniture offered to her by one of her children. (PRCSMF ¶ 9.) Further, she disputes that the furniture she left at the Property was solely intended for use by her grandson and his family, stating that she would use it when she was there, including for napping. (*Id.* ¶ 10.)

*Facts relied on by Cerci*

Ms. Cerci contends that she resided both at the Property and in the Castle Shannon home. Both she and Mrs. Denmark testified that she spent the majority of her non-work waking hours at the Property. (PRCSMF ¶ 7.) She contends that she was at the Property nearly every day since 2014 and did not change her address until after the fire. (*Id.*) Further, she maintained utility services in her name, maintained a mortgage on the Property and made most of the mortgage payments, paid the utility bills and real estate taxes, received mail at the insured premises, and performed routine maintenance. (*Id.*) She also kept some furniture, personal property and clothing at the Property, did laundry, ate meals and interacted with neighbors, among other things. (*Id.*)

Both Mr. and Mrs. Denmark testified that Ms. Cerci slept at the Property "about a quarter of the time" and "at least more than five times" since 2014. (PRCSMF ¶¶ 15-16.)

Ms. Cerci further notes that the both Mr. and Mrs. Denmark testified that she ate at the Property more frequently than she remembered, in fact, two to three times a week. Mr. Denmark also stated that she maintained a flip-top freezer where she stored food for her personal consumption. (PRCSMF ¶ 12.)

According to Ms. Cerci, she visited the Property 3 to 4 times per week and was there "all the time" or "a large part of the time." When she was there, she always went inside the home and the length of her routine stays ranged from half an hour to an hour to as late as 11 p.m. She had keys to the Property and could visit any time. Moreover, she kept a number of personal possessions there, including furniture, clothing, a laptop computer and books. Ms. Cerci also did her laundry at the Property once or twice a month, occasionally took showers there and

6

sometimes cut the lawn and performed yardwork,[6] as well as maintenance related activities. (ECF No. 30 at 4-7.)

### C. Analysis

1. Standard of Review

Summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). It may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Issues of credibility and the weight of evidence are to be decided by the trier of fact, not by the court at the summary judgment stage. *Id.* at 255.

The Third Circuit Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."

---

[6] Hartford notes that Ms. Cerci also testified that "[Mr. Denmark] would do it most of the time" and she would do so "only if he wasn't going to have time for it." (Cerci Dep. (ECF No. 33 Ex. B) 53:5-12.)

*National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.,* 242 F.3d 437, 446 (3d Cir. 2001).

      2.   <u>Breach of Contract Claim (Count I)</u>

Ms. Cerci claims in Count I that Hartford breached its contractual obligations by denying her claim on the basis that the Property was not the "residence premises." Hartford contends that based upon the clear and unambiguous terms of the Policy, Ms. Cerci's claim fails as a matter of law.

"A federal court sitting in diversity must apply state substantive law and federal procedural law." *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citation omitted). Here, the parties do not dispute that the Policy must be interpreted under Pennsylvania law. Pursuant to Pennsylvania law, the insured has the burden of proving facts that bring its claim within the policy's coverage. *Koppers Co., Inc. v. Aetna Cas. & Surety Co.*, 98 F.3d 1440, 1447 (3d Cir. 1996). "By contrast, the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." *Id.* (citations omitted).

The Pennsylvania Supreme Court has held that "the interpretation of an insurance contract regarding the existence or non-existence of coverage is 'generally performed by the court.'" *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (quoting *Minnesota Fire & Cas. Co. v. Greenfield*, 855 A.2d 854, 861 (Pa. 2004)). When the policy language is unambiguous, a court must give effect to its language; if a provision is ambiguous,

8

however, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage." *Id.* (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006)). Thus, it is first necessary to determine if the Policy is ambiguous.

### *Is the Policy ambiguous?*

As noted by the Pennsylvania Supreme Court in *Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*:

> The goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy. When the language of an insurance policy is plain and unambiguous, a court is bound by that language. Alternatively, if an insurance policy contains an ambiguous term, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning. Finally, the language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety.

106 A.3d 1, 14 (Pa. 2014) (citations omitted). A policy is not ambiguous simply because the parties disagree about its meaning. *Meyer v. CUNA Mut. Ins. Soc.,* 648 F.3 154, 64 (3d Cir. 2011).

The central issue here is not whether the loss is covered by the terms of the Policy.[7] Rather, Hartford contends that, because Ms. Cerci was not "residing" at the Property at the time of the fire, the Property was not the "residence premises" covered by the Policy, and thus, a condition precedent to coverage did not occur. "Pennsylvania law expressly recognizes that a provision requiring that an insured property be a 'residence' constitutes a condition precedent to

---

[7] As explained below, the Hartford adjuster concluded that the fire damage was covered under the Policy, but after the claim was transferred to the "large loss" department, the issue of Ms. Cerci's residence arose.

coverage." *Mu'Min v. Allstate Prop. & Cas. Ins. Co.*, 2011 WL 3664301, at *9 n.3 (E.D. Pa. Aug. 17, 2011); *see also Certain Underwriters at Lloyds's, London v. Clark*, 1998 WL 404807, at *5-6 (E.D. Pa. July 16, 1998) (holding that where the policy covered only the "residence premises," coverage was expressly conditioned on insureds residing at residence premises).

The Policy expressly defines "residence premises" to include, as applicable here, "the one family dwelling where you reside." The "one family dwelling" for which coverage was written is identified as the dwelling located at 2703 Grandview Avenue, McKeesport, Pennsylvania. Most courts have found language concerning "residence" to be unambiguous. *See Gerow v. State Auto Property & Cas. Co.*, 346 F. Supp. 3d 769, 778 (W.D. Pa. 2018) ("The Policy thus clearly makes coverage conditional on at least one of the insureds residing at the Subject Property"); *Campbell v. State Farm Fire & Cas. Co.*, 2018 WL 3468214, at *1 (W.D. Pa. July 18, 2018) ("In order for the Plaintiff to have coverage for the physical structure in question, the Plaintiff must 'reside' at the covered property for the policy to provide coverage for the loss."); *Chong Chen v. Allstate Ins. Co.*, 2012 WL 460416, at *5-6 (E.D. Pa. Feb. 14, 2012) (the definition of "dwelling" as "a one, two, three or four family building structure identified as the insured property on the Policy Declarations, where you reside and which is principally used as a private residence" clearly required residency as a condition precedent).

Ms. Cerci argues that the "residence premises" provision in the Policy is ambiguous and must be construed against Hartford because the term "reside" is not defined in the Policy. She supplies dictionary definitions of "reside," "dwell" and "live," noting that these definitions include multiple meanings.[8] As Ms. Cerci acknowledges, the word "reside" has been defined as

---

[8] ECF No. 31 Exs. 6, 7, 8.

10

"to dwell permanently or continuously." In turn, "dwell" can mean to "remain for a time" or "to live as a resident." These definitions are not dispositive of whether the "residence premises" clause in the Policy is ambiguous, however.

"Under Pennsylvania law, an individual's residence for purposes of an insurance policy is his 'factual place of abode' which is 'a matter of physical fact.'" *Gardner v. State Farm Fire*, 544 F.3d 553, 560 (3d Cir. 2008) (quoting *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.*, 545 A.2d 343, 346 (Pa. Super. 1988)). *See also In re Residence Hearing Before the Board of School Directors, Cumberland Valley School District*, 744 A.2d 1272, 1275 (Pa. 2000) ("Residence" . . . is "a factual place of abode" evidenced by a person's physical presence in a particular place); *GEICO Cas. Co. v. Alicea*, 416 F. Supp. 3d 425, 433 (W.D. Pa. 2019) ("the classical definition of a residence used by Pennsylvania courts is a factual place of abode, entailing living in a particular place, requiring only physical presence."); *Mu'Min*, 2011 WL 3664301, at *9 ("Pursuant to Pennsylvania law, construction of the term 'resident' in an insurance policy is a matter of law."). As noted by the Pennsylvania Superior Court in *Wall Rose Mut. Ins. Co. v. Manross*, ". . . we do not find the term "resident" ambiguous merely because it is not defined in the policy. Rather, in such a situation, we apply the common law definition historically used by the courts of this Commonwealth and apply it to the facts of the case. . ." 939 A.2d 958, 965 (Pa. Super. 2007), *appeal denied*, 946 A.2d 688 (Pa. 2008).

The Court concludes that the "residence premises" provision in the Policy is not ambiguous. The clause itself is specifically defined in the Policy. Moreover, the term "reside" within that provision has been defined by Pennsylvania courts in the insurance context and its meaning in that context is clear. Thus, the Court must apply the Policy's definition of "residence

11

premises" in its construction. *401 Fourth Street, Inc. v. Investors Ins. Group,* 879 A.2d 166, 171 (Pa. 2005).

As such, in order to obtain coverage under the Policy, Ms. Cerci must have resided at 2703 Grandview Drive, the "one family dwelling" identified in the Policy, when the loss occurred.

### *Did Cerci Reside at the Residence Premises?*

Ms. Cerci challenges Hartford's conclusion that she did not reside at the Property, and further asserts that whether she resided there is a disputed factual matter that is not susceptible of resolution at the summary judgment stage.

Courts have held that "the term 'resident' or 'residency' requires, at the minimum, some measure of permanency or habitual repetition." *Wall Rose,* 939 A.2d at 965 (citation omitted). As stated in *GEICO:*

> The key factor courts consider in making this determination is whether contact with the dwelling in question is regular or sporadic. As noted, there must be a sense of permanency or habitual repetition. Persons who have been found to reside at a certain place have demonstrated an "established pattern of spending significant time" there, [*Erie Ins. Co./Erie Ins. Exchange v.*].*Flood,* 649 A.2d [736,] 739 [(Pa. Commw. 1994)], and that they maintained their contacts as part of a regular pattern. On the other hand, persons with only occasional or sporadic contact with a residence are generally not found to reside there, regardless of whatever indicia of residency they can show. There is no specific amount of time a person must stay at a place to make it his or her residence, but courts have commonly found that those who sleep at a place no more than once a week or so are not residents of that place.

416 F. Supp. 3d at 433 (some citations omitted). "Courts have looked at factors such as where an individual sleeps, takes her meals, receives mail, and stores personal possessions." *Allstate Ins. Co. v. Naskidashvili*, 2009 WL 399793, at *3 (E.D. Pa. Feb. 16, 2009) (citations omitted). Under

12

Pennsylvania law, a person can have more than one residence. *See Wall Rose*, 939 A.2d at 968.[9] *See also GEICO*, 416 F. Supp. 3d at 432 ("no Pennsylvania appellate court has ever suggested that one is limited to one residence." (footnote omitted). However, a person's intent is not a factor, *Amica,* 545 A. 2d at 347, nor is her own identification of her residence. *Wall Rose,* 939 A.2d at 968.

Hartford cites several cases in which courts found as a matter of undisputed fact that the insured was not physically present at the "residence premises." *See Gerow*, 346 F. Supp. at 779-80 (insured visited the property only two to four times per month, usually just to check on it briefly); *Chong Chen*, 2012 WL 460416, at *6 (insured listed another address for his driver's license, car registration, insurance, bank statements and credit cards, paid taxes in another state, received no mail at the property and visited it only on the weekends); *Mu'Min*, 2011 WL 3664301, at *10-12 (insured slept at property only one to two nights per week, received his mail at two other addresses, had no personal possessions or telephone at the property and did not pay the utilities); *Gardner*, 544 F.3d at 560; *Certain Underwriters at Lloyds's*, 1998 WL 404807, at *6; *Amica*, 545 A.2d at 349 (daughter who only sporadically visited her father and kept certain personal items at his home was not a "resident" for purposes of the policy). *See also Campbell*, 2018 WL 3468214, at *1-2. Hartford contends that this case closely resembles *Gerow* because Cerci only "sporadically" visited the Property and at most, slept there only "intermittently."

---

[9] Hartford suggests that a second residence must be "a tarrying place for some specific purpose of business or pleasure" citing *In re Residence Hearing Before Bd. of Sch. Directors, Cumberland Valley Sch. Dist.*, 744 A.2d 1272, 1275 (Pa. 2000). However, that case concerned the term "residence" as contrasted with "domicile" in the Public School Code and is not applicable to this situation. *See Naskidashvili*, 2009 WL 399793, at *3 n.1 (rejecting attempt to import this definition into an insurance context).

However, in *Gerow* as well as *Mu'Min*, the properties were essentially left unoccupied for a significant period of time and the insureds showed no intent to return.

Moreover, many of the cases on which Hartford relies involve non-policyholders seeking coverage under the policy. Unlike those cases, Ms. Cerci, as the policyholder, is in direct privity with Hartford.

The Court concludes that unlike the cases cited by Hartford, whether Ms. Cerci resided at the Property cannot be resolved on a motion for summary judgment. As reflected in the record, there are a number of material facts that the parties dispute that are directly relevant to the outcome of this issue, as well as discrepancies between Ms. Cerci's testimony and that of the Denmarks, who lived at the Property. Ms. Cerci testified that she spent most of her non-work waking hours at the Property, was there virtually every day, ate many meals there, performed occasionally maintenance and left personal possessions there. Hartford argues that Cerci moved her furniture to the Castle Shannon Property, took most of her meals there, only visited the Property three or four times a week to check to make sure everything was all right, had no bedroom there and rarely if ever slept at the Property.[10]

Taking all of these facts in the light most favorable to Cerci and resolving all doubts and drawing all reasonable inferences in her favor, the Court concludes that there are genuine issues of material fact regarding whether Cerci resided both at the Property and the Castle Shannon Property. Thus, the jury must determine if Cerci had habitual and permanent contacts with the

---

[10] Hartford contends that, in her discovery responses, Ms. Cerci stated that she maintained her own bedroom where she occasionally slept but conceded at her deposition that this response was "untrue." (ECF No. 28 at 3 n.1; ECF No. 29 at 4 n.2.) However, neither this discovery response nor the page of her deposition Hartford cites are in the record. The Denmarks testified that Ms. Cerci slept there about a quarter of the time.

14

Property that demonstrate she resided there.

*Cerci's Reasonable Expectations*

In the alternative, Ms. Cerci argues that she reasonably expected that she had coverage for the Property, and as such, there are genuine issues of material fact that preclude summary judgment in Hartford's favor.

"Pennsylvania case law . . . dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 344 (3d Cir. 2005) (citation omitted). "In most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations." *Id.* Pennsylvania law recognizes only two limited circumstances in which the reasonable expectations doctrine may overcome the clear language of a policy: "(1) protecting non-commercial insureds from policy terms which are not readily apparent; and (2) protecting non-commercial insureds from deception by insurance agents." *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 440 (3d Cir. 2006). Inherent in both circumstances is the requirement for some action on the part of the insurer to either unreasonably obscure the terms or outright deceive the insured, hence the equitable basis for relief. Without evidence of such, the subjective expectations of the insured will fail to overcome the clear and unambiguous language of the policy. *Id.*

A policyholder with a direct relationship to the insurer has a more substantial argument that she reasonably expected coverage to continue on the property. *See Ionata v. Allstate Ins. Co.*, 2016 WL 4538756, at *4 (E.D. Pa. Aug. 30, 2016) (finding "that direct relationship with both the carrier and the Property for which she seeks coverage gives far greater force to the applicability of the reasonable expectations doctrine than many other coverage cases where it is

15

invoked.")

Ms. Cerci contends that she did not receive a copy of the Policy prior to the fire. (Cerci Dep. (ECF No. 31 Ex. 1) 73:20-22.)[11] It is undisputed that Hartford sent a confirmation sheet to Ms. Cerci that she signed in 2005 and returned to Hartford (ECF No. 33 Ex. D). The confirmation sheet lists the premium, the policy limits and other aspects of coverage. However, the confirmation sheet did not ask Ms. Cerci to confirm that she received a copy of the Policy. While Hartford's representative testified that it was company practice to include the policy along with the confirmation letter (Holmes Dep. (ECF No. 33 Ex. C) 15:14-17:13.), given Ms. Cerci's testimony, whether the Policy was sent with the confirmation sheet is a disputed fact.

Ms. Cerci argues that an insurer may not rely on an exclusion if it does not deliver a copy of the policy or otherwise make the exclusion known to the insured. However, as Hartford notes, the case she relies upon, although decided by the Pennsylvania Superior Court, was decided under Montana law. *Preferred Contractors Ins. Co., RRG, LLC v. Sherman*, 193 A.3d 1009, 1020 (Pa. Super. 2018) (under Montana law, the insured must establish that the insurer failed to deliver the policy and never otherwise timely disclosed the relevant coverage exclusions).

Nevertheless, Hartford provides no contrary authority on this issue. In fact, under Pennsylvania law, when an insurance representative testifies as to the general procedures for preparing and mailing policies and other documents, "[t]his testimony is sufficient for a jury to determine whether the pertinent documents were in fact mailed." *Nationwide Mut. Ins. Co. v.*

---

[11] Hartford cites the fact that, at another point in her deposition, Ms. Cerci responded to this question by stating "I don't think so." (Cerci Dep. (ECF No. 33 Ex. D) 110:22-24.) However, drawing all inferences in her favor as the non-moving party, the Court will rely upon her more definite statement that Hartford did not send her a copy of the Policy until after the fire. If these statements are inconsistent, that is a matter to be decided by the trier of fact.

*Hukill*, 2005 WL 8171757, at *2 (M.D. Pa. July 12, 2005) (citing *Breza v. Don Farr Moving & Storage Co.*, 828 A.2d 1131, 1135 (Pa. Super. 2003) and *Commonwealth v. Thomas*, 814 A.2d 754, 758, 761 (Pa. Super. 2002)). Although this triggers a presumption that the documents were received, whether or not the representative's testimony is believable is a jury question. *Id.*

In this case, it is undisputed that the confirmation sheet was mailed to Ms. Cerci in 2005 who signed and returned it, but whether Ms. Cerci received the Policy is a disputed fact that must be determined by the jury.[12] If she did not have a copy of the Policy, then she would not have seen the definition of "residence premises" and would not be on notice of the potential limitations on the coverage afforded under the Policy. Thus, these policy terms would not be "readily apparent" to Ms. Cerci.

Indeed, according to Ms. Cerci, she notified Hartford in 2013 that she was purchasing another house and would be spending time at both of them, but was not told that her coverage was in jeopardy or she would have to spend a certain amount of time at the Property in order to maintain coverage.[13] When asked if she would be living at both the Property and the Castle Shannon Property, Ms. Cerci told the Hartford agent: that she "might be in the new home a little more than I am in the current home. But I will be in both of them." (ECF No. 31 Ex. 10 at 1.) Ms. Cerci asserts that the agent did not inform her that the Policy was limited to one "residence," explain the meaning of "residence premises" in the Policy or alert her that coverage might be

---

[12] Hartford also notes that the signed form "confirmed that the Subject Premises was Plaintiff's primary residence." (ECF No. 33 at 5 n.3.) Although this information appears on the form, the Policy does not contain a requirement that the property had to be her primary residence. Moreover, the Property was, in fact, Ms. Cerci's sole residence in 2005.

[13] Hartford contends that Ms. Cerci also told the agent that she would be living at both properties for "six to eight months" while she had the Property renovated for sale, but that this did not occur. Nevertheless, the fact remains that Ms. Cerci states that she was not told that her coverage was limited to one "residence premises."

17

impacted. Moreover, it is undisputed that in 2017, after she purchased the Castle Shannon Property, Ms. Cerci submitted at least one claim under the Policy for a loss related to the Property that Hartford paid without any question. These facts, taken in the light most favorable to Ms. Cerci as the non-moving party, are sufficient to support her reasonable expectation that there was coverage on the Property even after she purchased the Castle Shannon Property.

Thus, even assuming that that Ms. Cerci was not "residing" at the Property on the date of the loss, there are genuine issues of material fact regarding whether she had a reasonable expectation of coverage.

Therefore, with respect to Count I, Hartford's motion for summary judgment should be denied.

    3. <u>Bad Faith Claim</u>

Ms. Cerci also alleges that Hartford engaged in bad faith conduct in violation of 42 Pa. C.S. § 8371. In its summary judgment motion, Hartford contends that there is no record evidence that it lacked a reasonable basis for the way in which it handled the claim.

Pennsylvania's bad faith statute provides that in an action arising under an insurance policy, an insured is entitled to damages if the court finds that the insurer has acted in bad faith toward the insured. 42 Pa. C.S. § 8371. A bad faith claim is distinct from the underlying contractual insurance claim from which the dispute arose. *Nealy v. State Farm Mut. Auto. Ins. Co.*, 695 A.2d 790, 792 (Pa. Super. 1997), *appeal denied*, 717 A.2d 1028 (Pa. 1998).

The Pennsylvania Supreme Court has held that, "in order to recover in a bad faith action, the plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.*,

18

170 A.3d 364, 365 (Pa. 2017) (adopting test first articulated in *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. 1994)). Further, "proof of an insurer's motive of self-interest or ill-will, while potentially probative of the second prong, is not a mandatory prerequisite to bad faith recovery under Section 8371." *Id.* at 377.

Ms. Cerci asserts that multiple facts support her bad faith claim. First, she notes that Hartford paid a smaller claim for water damages in 2017 and never raised the issue of the residence premises with her. She also notes that the adjustor initially deemed her claim a covered peril, but then Hartford transferred the matter to the "large loss department" and denied the claim based on the residence premises issue. Finally, she points out that she specifically notified Hartford that she was buying a second home in 2013 and was not told that she would lose coverage because of the residence premises definition.

Hartford argues that because it had a reasonable basis for denying Ms. Cerci's claim, it cannot have acted in bad faith. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999). As explained above, however, the Court cannot determine based upon the existing record whether Hartford had a reasonable basis for its denial.

Ms. Cerci asserts that Hartford's behavior during the claim process is evidence that supports of her bad faith claim. Ms. Cerci notes that Hartford paid prior claims without incident. While Hartford claims that there is no evidence that it learned she was no longer residing at the Property when it adjusted those claims (ECF No. 33 at 4), there is record evidence that Ms. Cerci told Hartford in 2013 that she was buying a second house and would be spending time at both. Moreover, an inference can be drawn in Ms. Cerci's favor as the non-moving party that it was only when she submitted a "large loss" that Hartford asserted that the claim was not covered. Further, Hartford's adjustor initially concluded that the loss was covered and it was only when

19

the claim was transferred to the "large loss" department that the "residence premises" issue arose. While the Court does not make any finding regarding whether Hartford engaged in bad faith, it does conclude that genuine issues of material fact preclude summary judgment in Hartford's favor.

Therefore, Hartford's dispositive motion as to Count II should be denied.

### III.     Conclusion

For these reasons, it is recommended that Defendant's motion for summary judgment (ECF No. 28) be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by October 11, 2021. Any party opposing the objections shall file a response by October 25, 2021. Failure to file timely objections will waive the right of appeal.

Dated:  September 27, 2021

                                                s/ Patricia L Dodge
                                                PATRICIA L. DODGE
                                                United States Magistrate Judge